IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21CR115-1 |
| | ) | |
| JAMES EDWARD MCDONALD, | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Before the Court is Defendant James Edward McDonald's Motion to Suppress, (ECF No. 13.) Defendant filed this motion on January 24, 2022, (ECF No. 13), which came on for hearing on February 10, 2022, (ECF No. 18). Defendant argues that "Durham Police Department ('DPD') Officers unconstitutionally seized [Defendant] when they blocked in his vehicle, trained a gun on him, and ordered him to shut his car off prior to developing the requisite reasonable suspicion." (ECF No. 13 at 1.) Defendant seeks "to suppress the use of any item or evidence seized by police officers on September 11, 2020, from the Defendant or his vehicle in Durham, North Carolina," as well as "use of any statements made by the Defendant after the illegal search and seizure on September 11, 2020." (*Id.* at 15.) For the reasons stated herein, the motion will be denied.

**I.   FINDINGS OF FACT**

This case involves events surrounding the execution of an arrest warrant for an individual other than the Defendant, Joseph Cates. Cates was a known gang member with

1

multiple outstanding warrants, including one for aggravated assault. (Tr. 87:25–88:10.[1]) Durham County Police received a tip that Cates was posting live video to Instagram of himself and another individual on September 11, 2020, at the Cornwallis public housing unit ("Cornwallis"). (Tr. 86:6-7, 87:3-5, 87:14-24, 88:19–89:1.) Both Cates and the second individual were brandishing firearms in the video. (Tr. 87:19-21.) The second individual had a dreadlock hairstyle. (Tr. 89:8-11.)

Officer Thomas Greathouse and two other officers were tasked with arresting Cates. (Tr. 89:12-19.) The three officers traveled the approximate five to ten minutes from their station to Cornwallis in an unmarked police SUV. (Tr. 90:1-4, 12.) They were not in uniform but wore bullet-proof vests that had "POLICE" written on front and back. (Tr. 90:8-9.) Officer Greathouse described Cornwallis as "one of the higher crime areas in the city of Durham." (Tr. 91: 7-8.) He based this conclusion on discussions with officers that have patrolled the area and his own work executing search warrants for drugs and assisting in buy-busts, (Tr. 90:25–91:4), though he was unable to recall ever seizing any firearms or drugs during these investigations, (Tr. 132:9-20).

As the officers arrived, Officer Greathouse recognized Cates standing between a silver Honda Pilot and a black Chevrolet sedan in the Cornwallis parking lot. (Tr. 91:9-20.) The Honda was backed into a parking space such that it faced into the parking lot and away from the apartments. (Tr. 91:16-17.) Two individuals sat in the Honda: Defendant sat in the driver's seat and a woman sat in the front passenger seat. (Tr. 97:22–98:9.) The black sedan was facing

---

[1] Citations are to the Realtime Feed – Unedited/Uncertified Transcript for the February 10, 2022, Criminal Session before this Court ("Tr.").

the apartments. (Tr. 91:15.) Its front, driver-side door was open but the car was empty. (Tr. 129:12-23.) The two cars were spaced about one car length apart. (Tr. 91:15-17.) Cates stood closer to the Honda—approximately three-to-five feet from its front, driver's side door—faced the driver's seat, and appeared to interact with Defendant. (Tr. 91:9-20, 92:14-21.) Another man and two women were standing with Cates approximately three-to-five feet from the Honda. (Tr. 92:8-13.) The man with this group had dreadlocks. (Tr. 141:25–142:3.)

The events critical to Defendant's motion all occurred within a few seconds. As the officers arrived at Cornwallis, Cates turned toward the police vehicle and pulled a pistol from his pants. (Tr. 91:23, 92:22-23.) Officer Greathouse, who was sitting in the rear, passenger-side seat, drew his pistol and opened his door before the officers' vehicle came to a stop. (Tr. 94:15-17.) The officers stopped their vehicle roughly six feet from the front of the Honda and exited. (Tr. 93:8.) As the officers exited, Cates turned and fled. (Tr. 92:1-7.) Two officers chased Cates. (Tr. 92:24–93:5.) Officer Greathouse exited but did not chase Cates. (Tr. 94:15–95:4.) He was the only officer remaining at the scene. (*Id.*)

At that time, Officer Greathouse heard the Honda's engine rev. (Tr. 95:7-8.) Officer Greathouse focused on the Honda as soon as he heard the revved engine. (Tr. 95:17.) The Honda did not move, but Officer Greathouse observed "a lot of movement" in the car, and it appeared to him as if the two occupants were bending down and reaching directly under them. (Tr. 95:14-15, 20-24.) Officer Greathouse pointed his pistol at the Honda and commanded Defendant and the other occupant to show him their hands and to "shut the vehicle off." (Tr. 96:5-9.) Defendant complied. (Tr. 98:14.)

3

The police SUV faced the Honda but was off-center, slightly to the Honda's right. (Tr. 93:6-14.) Officer Greathouse initially testified that there was sufficient room for the Honda to leave the parking space to its left—to the right of the police vehicle[2]—but on cross examination agreed that, given his position in the parking lot, the Honda could not have driven away without running over him. (Tr. 93:25–94:10, 128:17–129:1.)

"Within seconds" of exiting the police vehicle, Officer Greathouse smelled marihuana. (Tr. 96:13-15.) The odor was strong enough that he believed it was coming from a concentrated source and not simply lingering in the air, since based on his training and experience odor lingering in the air "would have dissipated quicker." (Tr. 96:16-19.) He looked but did not see any smoke rising from the ground that could have indicated that a dropped cigarette was the source of the odor, and therefore concluded that the odor was likely coming from the Honda. (Tr. 96:15–97:4.)

Officer Greathouse crossed the parking lot to take cover behind the black Chevrolet sedan. (Tr. 97:4-11, 98:6-12.) He observed that Defendant had a dreadlock hairstyle. (Tr. 97:22-98:9.) Defendant rolled up his window. (Tr. 110:8-9.) Officer Greathouse then crossed back to the police SUV and radioed for backup. (Tr. 98:14-18.) Despite Officer Greathouse's continued commands, Defendant and the Honda's other occupant lowered their hands out of view several more times. (Tr. 98:20-25.) Officer Greathouse eventually approached the Honda and frisked Defendant inside the car for weapons. (Tr. 99:2-13.) He smelled the odor of marihuana more strongly and determined it was coming from inside the Honda. (Tr.

---

[2] At the conclusion of the incident, the Honda's owner was able to drive the Honda past the police SUV and leave the parking lot without moving the police vehicle. (Tr. 93:25–94:10.)

4

100:16-19.) Officer Greathouse also observed a digital scale in the Honda which he believed to be drug paraphernalia. (Tr. 100:2-4.) When he asked Defendant if a weapon was present inside the car, Defendant looked down. (Tr. 99:8-13.) Based on Officer Greathouse's training and experience, he believed that Defendant was instinctively looking at a weapon hidden under his seat. (*Id.*) Officer Greathouse instructed Defendant to exit the vehicle, handcuffed him, and frisked him again. (Tr. 99:19-22, 101:16–102:8.) He asked the other individual in the Honda to exit as well. (Tr. 102:9-16.)

The man and two women standing near the Honda remained in the vicinity during these events. (Tr. 95:17-18.) Officer Greathouse testified that he did not focus on them because they were "not reaching," and he did not observe any bulges that would indicate a pistol, (Tr. 95:19-20, 140:22–141:14). He described them as "very compliant." (Tr. 95:19-20.) Body camera footage revealed that the three were partially compliant. They did not lay down or disperse when instructed, and one woman crossed over to the black Chevrolet sedan and closed its door. (Tr. 129:15-23.) The man did, however, keep his hands visible for most of the encounter and stepped away from the Honda when instructed to do so.

Additional officers arrived on the scene roughly nine minutes later. (Tr. 102:24–103:2.) Officer Greathouse then searched the Honda and found a pistol, digital scales, vacuum seal baggies, and 30.8 grams of marihuana. (Tr. 103:19-24.) He asked Defendant if he had smoked marihuana recently, and Defendant admitted that he had done so. (Tr. 118:13-23.) Officer Greathouse then searched Defendant's person and found a pill bottle containing 6.4 grams of cocaine. (Tr. 104:4-7.)

5

Defendant is charged in a four-count Indictment with: Count I – Possession of cocaine with intent to distribute; Count II – Possession of marihuana with intent to distribute; Count III – Possession of a firearm in furtherance of a drug trafficking crime; and Count IV – Felon in possession of a firearm. (ECF No. 1.)

## II. LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that the Fourth Amendment is incorporated and applied to the states by the Due Process Clause of the Fourteenth Amendment). Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant. *See Taylor v. Alabama*, 457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).

A brief, non-consensual detention is lawful only if supported by reasonable suspicion. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Reasonable suspicion requires "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "In determining whether a detention is supported by reasonable suspicion, we look to the circumstances known to the officer and 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). In so doing, the court must consider "the totality of the circumstances—the whole picture." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Courts have recognized a number of factors that

6

may contribute to reasonable suspicion, including unprovoked flight from police, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the relevant characteristics of the location as a "high crime area," *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–48 (1972)), evasive conduct, *Smith*, 396 F.3d at 584, and furtive behavior, *United States v. Sims*, 296 F.3d 284, 286–87 (4th Cir. 2002). Reasonable suspicion may exist even when relevant conduct also has an "innocent explanation." *Wardlow*, 528 U.S. at 125.

Relying on *United States v. Poms*, 484 F.2d 919 (4th Cir. 1973), the Government argues that an officer may detain and search an arrestee's companions without reasonable suspicion. (ECF No. 17 at 11.) In *Poms*, the Fourth Circuit held that "officers may conduct a limited search for weapons of a known companion of an arrestee who is within vicinity of the arrest." *United States v. Hicks*, 121 F.3d 701, 1997 WL 540910, *2 (4th Cir. 1997) (unpublished) (citing *Poms*, 484 F.2d at 919 (4th Cir. 1973)). However, the Fourth Circuit came to that conclusion only after "applying the teaching of *Terry* to the facts and circumstances" in that case. *Poms*, 484 F.2d at 921. This Court therefore finds that Defendant's interaction with Cates may factor into the reasonable suspicion analysis under the *Terry* totality of the circumstances test but is insufficient on its own to justify a search or seizure. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *Sibron v. New York*, 392 U.S. 40, 62 (1968) ("The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.").

## III. DISCUSSION

A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty" of the defendant. *Jones*, 678 F.3d at 299 (quoting *Terry*, 392 U.S. at 19 n. 16). Absent physical force, a seizure requires assertion of authority and "*submission* to the assertion of authority." *United States v. Brown*, 401 F.3d 588, 594 (4th Cir. 2005) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). An act constitutes a show of authority if a reasonable person would not "feel free 'to disregard the police and go about his business.'" *Id.* at 593 (quoting *Bostick*, 501 U.S. at 434). This is objective inquiry requires consideration of "[a] number of circumstances, . . . including 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)

Here, the officers first asserted their authority over Defendant upon their arrival. The officers parked facing the Honda and exited with weapons drawn. Although Defendant was not physically touched at this time, he was unable to drive the Honda safely away without striking either the police vehicle or Officer Greathouse. The Fourth Circuit has found similar police conduct can amount to a seizure. *See, e.g.*, *United States v. Stover*, 808 F.3d 991, 997 (4th Cir. 2015) (finding a seizure where officers "blocked [defendant's] vehicle, were armed and uniformed and approached [defendant] immediately"); *Jones*, 678 F.3d at 301 (finding a seizure where officers followed defendant's car into a private drive and effectively blocked him from moving his vehicle). However, in this case Defendant did not initially submit to this authority

8

but instead revved his engine, which indicated an attempt to leave the scene. It was not until Officer Greathouse pointed his pistol at Defendant and instructed him to turn off the Honda that Defendant complied. Thus, the Court finds that this second act constituted a seizure.

Officer Greathouse had several pieces of relevant information at the time of this seizure. First, he knew that at least two individuals in the vicinity were armed with pistols. Cates had shown his pistol as he fled, but the other was unaccounted for. Second, he observed Cates standing near the Honda and it appeared Cates was interacting with its driver. Third, he heard the Honda rev its engine and inferred that Defendant was attempting to flee. Fourth, he smelled marihuana, and while he could not yet particularize this smell to the Honda, the smell combined with Defendant's apparent attempt to flee contributed to his suspicion of criminal behavior. Finally, he saw Defendant and the Honda's second occupant reaching down, which he believed based on his experience may have been an attempt to either retrieve a weapon or destroy evidence of criminal conduct. The Court finds that the totality of these circumstances gave Officer Greathouse a reasonable suspicion of criminal activity and a reasonable fear for his safety.

Officer Greathouse reacted quickly by pointing his gun, taking cover, and issuing commands. He then approached the Honda and frisked Defendant. These actions were consistent with the limited scope of a *Terry* stop and reasonable under the circumstances. *See United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) ("[W]e have concluded that drawing weapons . . . or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest."). Officer Greathouse had a reasonable suspicion that Defendant was involved in criminal activity and a rational fear that Defendant would attempt to evade

9

capture by either driving through Officer Greathouse or retrieving a weapon from under his seat. The Fourth Amendment does not require that, under these circumstances, Officer Greathouse gather more information before taking reasonable action to mitigate this risk. *See Terry*, 392 U.S. at 23 ("[The Fourth Amendment does not] require that police officers take unnecessary risks in the performance of their duties."); *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988) ("Investigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop."). Thus, the Court finds that Officer Greathouse's seizure of Defendant was reasonable and lawful under the Fourth Amendment.

Soon after seizing Defendant, Officer Greathouse frisked Defendant inside his car. This, too, was reasonable as Officer Greathouse "reasonably suspect[ed] that [Defendant] 'may be armed and presently dangerous.'" *United States v. Weatherspoon*, 821 Fed. App'x 231, 233 (4th Cir. 2020) (quoting *Terry*, 392 U.S. at 30). By this time, Officer Greathouse was able to particularize the marihuana odor to the Honda based on the concentration of the odor, the lack of other sources, and the increase in strength of the smell when he approached Defendant's car. This gave Officer Greathouse probable cause to search the Honda for marihuana. *See United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) ("[W]e we have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." (internal quotations omitted)). The subsequent search of Defendant's person and his ultimate arrest were likewise supported by ample probable cause.

10

Case 1:21-cr-00115-UA Document 19 Filed 02/16/22 Page 10 of 11

In conclusion, the Court finds that the initial seizure and subsequent search of Defendant and the Honda were lawful under the Fourth Amendment. Accordingly, Defendant's motion will be denied.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress, (ECF No. 13), is DENIED.

This, the 16th day of February 2022.

/s/ Loretta C. Biggs
United States District Judge